**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Criminal No. 25-mj-00024** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **DAVID A. WILLIAMS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

Defendant David A. Williams should be detained pending trial under 18 U.S.C. §§ 3142(f)(1)(A) (crime of violence) and 3142(f)(1)(E) (felony involving the possession or use of a firearm).   The defendant is charged with two armed robberies of small businesses in the District of Columbia As explained below, the defendant is also connected to three other armed robberies involving 2 other businesses. The defendant's actions have terrorized employees of these small businesses over a course of months.

Mr. Williams pointed a handgun directly at store employees while he demanded cash from the register. The charged offenses alone emphasize the danger posed by the defendant to the community. Indeed, given the charges, there is a statutory rebuttable presumption that no condition or combination of conditions can reasonably assure the safety of the community pursuant to 18 U.S.C. 3142(e)(3)(B). Yet even without the presumption, the defendant's illegal conduct is so rampant, so reckless, and so dangerous that pursuant to the 18 U.S.C. § 3142(g) factors analyzed below, no conditions or combination of conditions short of detention will ensure the safety of the community. This Court should detain Mr. Williams pending trial.

## **FACTUAL BACKGROUND**

Defendant Williams is charged with four counts in connection with two separate robberies that occurred within the District of Columbia over the past month. He is also connected to at least three other armed robberies dating back to July of last year. Although the investigation is ongoing, there is substantial evidence that links defendant Williams to those three other robberies. All five are summarized in the table below.

| Identifier | Date | Business | Business Address | Weapon |
|---|---|---|---|---|
| Robbery 1 | July 3, 2024 | Subway | 3204 Pennsylvania Avenue Southeast, Washington, D.C., 20020 | firearm |
| Robbery 2 | December 29, 2024 | Subway | 3204 Pennsylvania Avenue Southeast, Washington, D.C., 20020 | firearm |
| Robbery 3 | December 30, 2024 | Manny & Olga's | 1430 Pennsylvania Avenue Southeast, Washington, D.C., 20003 | firearm |
| Robbery 4 | January 14, 2025 | Chipotle | 3204 Pennsylvania Avenue Southeast, Washington, D.C., 20020 | firearm |
| Robbery 5 | February 3, 2025 | Dunkin' Donuts | 850 Quincy Street Northwest, Washington, D.C., 20011 | firearm |

1. ***July 3, 2024 Subway Robbery (The Shops at Penn Branch)***

On Wednesday July 3, 2024, at approximately 6:00 PM, Metropolitan Police Department (MPD) officers responded to the Subway restaurant at 3204 Pennsylvania Avenue Southeast for a report of an armed robbery. The complainant advised that a skinny black male, approximately 5' 11" tall, wearing a mask and glasses, had entered the store, brandished a firearm, while demanding money out of the register, then left.

When officers arrived, they were met by two restaurant employees. MPD detectives interviewed both witnesses with the assistance of Spanish-speaking officer. Both complainants gave a similar account of events. One of the witnesses, (Witness A1) explained that she and another

employee, (Witness A2) were cleaning the front of the store when the suspect approached Witness A2 at the register. The suspect lifted his shirt, pulled a black in color handgun out of his black satchel, and told Witness A2, "Open the drawer!" Witness A1 stated that she noticed that Witness A2 did not understand the suspect and appeared nervous, so she went to open the register for him. The suspect placed the handgun on the counter while both victims handed him approximately $100 in U.S. currency. The suspect then grabbed the till from the employees and poured the loose coin currency into a Subway cookie bag. The suspect told Witness A1 and Witness A2 not to move as he walked out of the location and fled northbound on the 1600 block of Branch Avenue Southeast.

Officers reviewed footage from the Subway's surveillance cameras and noted that the timestamp on the videos was approximately four hours behind the actual time. The footage showed the suspect, a black male, wearing a black t-shirt with a white undershirt, gray pants, white, black and red sneakers, a white dust mask, a white Nike baseball cap, and a black crossbody bag across his chest walk up to the register at approximately 5:57 PM with a black handgun in his right hand. While the suspect appeared to speak and gesture to the slide, he racked the slide on the handgun, ejecting a cartridge from the chamber. One of the employees went to the cash register, opened it and began handing the money to the suspect. The suspect then put both the handgun and the money into his crossbody bag. The employee closed the cash register and then opened it again. At this point another employee approached the cash register and removed a box with loose change. The suspect held open a cookie bag, took the box from the employee, and poured the change into the bag. The suspect then appeared to grab money from the tip jar before walking toward the door at approximately 5:58 PM.



***Suspect in the July 3 Subway robbery***

**2.**  ***December 29, 2024 Subway Robbery (The Shops at Penn Branch)***

On December 29, 2024, at approximately 2:18 PM, MPD officers were dispatched to respond to the same Subway restaurant at 3204 Pennsylvania Avenue Southeast for another report of an armed robbery.

Restaurant employees told responding officers that a single person had come into the restaurant and taken money. The suspect was described as "skinny," wearing all black, and armed with a gun. The suspect took approximately $70 and left on foot. The employees said that the suspect did not say anything, just pointed at the cash register. The employees showed MPD officers footage from the surveillance cameras, which showed that the suspect was actually wearing gray. Officers noted that the timestamp on the camera system was approximately three hours earlier than the actual time.

The Subway surveillance footage showed a black male wearing a gray hooded sweatshirt, gray pants, a dark Nike baseball cap, and a medical-type mask enter the Subway at approximately

2:17 PM. As the suspect approached the cash register, he reached into a bag that was slung over his shoulder and drew a black handgun. The suspect held the gun on top of the counter and gestured toward the cash register. The employee at the register opened it and handed a box with cash to the suspect. The suspect took the cash and put it in his pocket. The suspect gestured toward a shelf with visible currency, at which point employee retrieved it and handed it to the suspect, who again put it in his pocket. The employee showed the suspect the remaining items from the cash register and poured out some change. The suspect examined some of the items, put the firearm back in his bag, and then left without taking the additional change. At approximately 2:18 PM, the suspect exited the Subway and walked toward Branch Avenue Southeast.

On CCTV footage from The Shops at Penn Branch, the suspect was first seen at approximately 2:03 PM after apparently disembarking an eastbound Metrobus at the corner of Pennsylvania Avenue Southeast and Branch Avenue Southeast. The suspect crossed the street and walked east along Pennsylvania Avenue Southeast toward The Shops at Penn Branch before entering the parking lot. The suspect then walked back toward Branch Avenue Southeast, passing the entrance to the Subway restaurant at approximately 2:08 PM. The suspect then walked to the bus stop shelter at the northwest corner of Branch Avenue Southeast and Pennsylvania Avenue Southeast. At approximately 2:15 PM, the suspect left the bus stop and walked back toward The Shops at Penn Branch. The suspect walked toward the rear parking lot and loitered for a short period before walking to the front. At several times, the suspect was holding and/or looking at a phone. The camera showing the Subway entrance was not activated when the suspect entered, but at approximately 2:18 PM, the suspect exited the Subway and walked back to the bus stop at the northwest corner of Pennsylvania Avenue Southeast and Branch Avenue Southeast. At approximately 2:22 PM, the suspect boarded a westbound Metrobus.



***Suspect in December 29 Subway robbery***

3.  ***December 30, 2024 Manny and Olga's Robbery and Flight (Charged)***

On December 30, 2024, at approximately 8:00 PM, MPD officers responded to Manny & Olga's Pizza at 1430 Pennsylvania Avenue Southeast, Washington, DC for a report of an armed robbery.

An MPD detective interviewed the cashier (Witness C1). Witness C1 said that she was sitting down behind the cash register when the suspect entered the establishment and asked if the business takes cash. Witness C1 stated that she replied yes and went to the cash register because she thought the suspect was going to place an order. Witness C1 stated that the suspect then told her to give him all the money and pulled out a black handgun. Witness C1 stated that she then opened the cash register and gave the suspect all the money from the register. Witness C1 stated that, after getting the money, the suspect walked out of the store and then walked west on Pennsylvania Avenue SE. Witness C1 described the suspect as a black male, 25-30 years old, wearing a brown coat with squares on it, carrying a dark green fanny pack.

An MPD Detective interviewed another employee (Witness C2) with the assistance of an MPD officer who was a Certified Spanish Interpreter. Witness C2 stated that he was working in the kitchen area of Manny & Olga's making a pizza, when he looked up and saw the store being robbed. Witness C2 stated that he saw Witness C1 handing money to the suspect, who had a black gun in his hand. Witness C2 described the suspect as a black male with a brown jacket with square designs, a blue mask covering his face, armed with a black handgun.

Witness C1 provided recorded video footage from the Manny & Olga's Pizza to MPD detectives, which confirmed Witness C1's narrative of events.

After fleeing the business, Mr. Williams boarded a Metrobus and reversed his coat to change his appearance. Later, he took off the surgical mask and obtained a plastic grocery bag to store his coat, further changing his appearance. However, Mr. Williams continues to wear the distinct, striped hoodie he is seen wearing during the robbery.



***Mr. Williams on December 30 at Manny and Olga's***

An MPD CCTV camera located at Potomac Avenue Southeast and Pennsylvania Avenue Southeast showed the suspect run west on the north sidewalk of the 1300 block of Pennsylvania Avenue Southeast toward a Metrobus parked in front of the Potomac Avenue Metro Station. The suspect does not appear pay the fare. The bus, bearing number 4546 on the roof, drove off and turned east on Pennsylvania Avenue Southeast.

An MPD CCTV camera located at Minnesota Avenue Southeast and Pennsylvania Avenue Southeast showed the suspect exit Metrobus 4546 at 8:03 PM and walk east on Pennsylvania Avenue Southeast.



***Suspect after exiting the Metrobus on December 30***

FBI agents reviewed video footage from a Shell gas station at 2501 Pennsylvania Avenue Southeast. The suspect was seen walking east on Pennsylvania Avenue Southeast past the gas station. The suspect was wearing the same clothing, but appears to have reversed his coat, to change his appearance. However, his pants, sweatshirt, and shoes appear to be the same. The suspect was seen walking toward a supermarket at 2529 Pennsylvania Avenue Southeast.

FBI agents reviewed video footage from the supermarket at 2529 Pennsylvania Avenue Southeast. The suspect was seen entering the store, with no mask. The suspect approached the front counter and obtained a shopping bag. The suspect then removed his coat, placed it into the bag and exited the store. The suspect was last seen walking east on Pennsylvania Avenue Southeast toward 27th Street Southeast at approximately 8:06 PM.



*Still images showing the suspect having changed attire before entering (left) and again before leaving (right) the supermarket*

4.  <u>**January 14, 2025 Chipotle Robbery (The Shops at Penn Branch)**</u>

On January 14, 2025, at approximately 6:38 PM, MPD officers responded to the Chipotle restaurant at 3240 Pennsylvania Avenue Southeast, Washington, DC for a report of an armed robbery.

An MPD detective spoke with an employee (Witness D1) who said that she was near the back of the kitchen prior to the offense. Witness D1 said that she was grabbing a stack of napkins when she observed the suspect enter the restaurant and approach the counter while brandishing a pistol. Witness D1 said that the suspect then pointed the pistol at her while stating, "You need to open the cash register."

Witness D1 explained she attempted to open the register with the keys but was unable to, due to the stress of the situation. Witness D1 explained that moments later, Witness D2 came to the register and opened it for the suspect, who grabbed the money and fled out of the restaurant.

Witness D1 described the suspect as a tall black male, approximately in his thirties, with a skinny build, wearing a black jacket, black pants, with a short beard and short hair.

The MPD detective then spoke with the assistant manager of the restaurant (Witness D2). Witness D2 explained that only he and Witness D1 have access to the cash register. Witness D2 said that when the suspect had entered the restaurant and brandished the firearm, he was in the back office and heard a commotion. Witness D2 then looked at the security cameras, realized what was happening, and went to the register to open it, so the suspect could obtain the money. Witness D2 said that when he walked to the register, the suspect pointed the gun at him and stated, "Come open the register up," before putting the gun in his pocket.

Witness D2 said that after taking the money from the register, the suspect exited the restaurant and walked towards the area of the bus stop at Pennsylvania Avenue Southeast and Branch Avenue Southeast. Witness D2 said that he continued to watch the suspect. Witness D2 believed he saw the suspect rob an unknown citizen near Pennsylvania Avenue Southeast and Branch Avenue Southeast (responding officers did not locate anyone claiming to have been robbed at that location). Witness D2 then went back into the restaurant and waited for police to arrive.

Witness D2 said that the suspect took approximately $813.00 U.S. currency from the register.

Witness D2 described the suspect as a black male, light complexion, tall, muscular build, wearing a ski mask, Helly Hanson snow pants with suspenders, black coat, approximately in his 30s, and possibly with a tattoo near his eye.

The MPD detective spoke with another employee (Witness D3) who was near the cash register at the time of the offense. Witness D3 said that she observed the suspect enter the restaurant, approach the counter where the register is located, and point a handgun at Witness D3

while saying, "Give me the money, open the register." Witness D3 said that she did not have access to the register and the suspect said, "You think I'm playing with you? Open the register." Witness D2 then attempted to open the register as Witness D3 went to the back of the kitchen.

Witness D3 described the suspect as a black male, approximately 6'1", wearing a white puffer coat with a black collar, black pants, medium build, approximately in his twenties, and wearing a ski mask.

Multiple witnesses provided similar accounts, with small variations in descriptions, such as the color of the clothing or the suspect's height.

An MPD detective obtained video footage from the surveillance cameras in the Chipotle. The footage showed the suspect, a black male wearing a white and black zip up jacket, Helly Hansen suspender style snow pants, a black ski mask, and black sneakers enter the restaurant at approximately 6:36 PM. The suspect then walked to the cash register where Witness D3 was working and removed a black handgun from inside of his jacket, which he pointed toward Witness D3. Witness D3 appeared to speak with the suspect before walking to the back of the restaurant. The suspect then walked around the counter toward the kitchen with the pistol in his hand and waited until Witness D1 emerged from the back carrying a stack of napkins. Witness D1 walked to the register and was followed by the suspect. Witness D2 then appeared to attempt to unlock the register while the suspect walked back towards the kitchen and went out of view for a moment. Witness D2 then walked from the back of the kitchen to the cash register with the suspect following him. Witness D2 then retrieved the keys from Witness D1 and opened the register for the suspect who took the cash out of the till. After removing the money, the suspect exited the restaurant at approximately 6:38 PM.



***Suspect during the January 14 Chipotle robbery***

On exterior video footage from The Shops at Penn Branch, the suspect was first seen at approximately 6:30 PM, walking east on Pennsylvania Avenue Southeast and entering a bus stop shelter at the northwest corner of Pennsylvania Avenue Southeast and Branch Avenue Southeast. At approximately 6:34 PM, the suspect left the bus stop and walked east along Pennsylvania Avenue Southeast, toward The Shops at Penn Branch. The suspect crossed the parking lot and entered the Chipotle at approximately 6:36 PM. At approximately 6:38 PM, the suspect exited the Chipotle, walked back across the parking lot, and began running west along Pennsylvania Avenue Southeast. The suspect approached a Metrobus stopped at the bus stop at Pennsylvania Avenue Southeast and Branch Avenue Southeast before being lost from view.

On footage from the Metrobus, the suspect can be seen boarding the bus, carrying a bag in his hand, at approximately 6:39 PM. The suspect does not appear to pay the fare. The suspect sat

in the rear of the bus and appeared to change his coat with one from the bag he was carrying. At approximately 6:41 PM, the suspect exited the bus at Pennsylvania Avenue Southeast and 28th Street Southeast in Washington, DC. The suspect walked west on Pennsylvania Avenue Southeast, crossed the street, and walked south on 27th Street Southeast before being lost from view.



***Suspect entering a Metrobus (left) and leaving after changing coats (right)
following the January 14 Chipotle robbery***

5. ***<u>February 3, 2025 Dunkin' Donuts Robbery and Flight (Charged)</u>***

At approximately 1:30 PM on February 3, 2025, MPD officers responded to a report of an armed robbery at a Dunkin' Donuts located at 850 Quincy St Northwest, Washington, DC. Officers spoke with an employee (Witness E1) who stated that the suspect demanded money from the register. When Witness E1 asked why the suspect drew a black handgun and said, "Do you think I am playing?" Witness E1 took the tray out of the register, placed it on the counter, and allowed the suspect to take the money. An MPD CCTV camera captured an image of the suspect exiting the Dunkin' Donuts.



***Williams leaving the Dunkin' Donuts***

Notably, in the MPD CCTV footage, the suspect was wearing a hooded sweatshirt with vertical stripes, a black ski mask, camouflage pants, and two crossbody bags, including a green bag with a black strap. In the MPD CCTV footage, the suspect walks south along Georgia Avenue Northwest at approximately 1:26 PM and enters the WMATA Georgia Ave-Petworth Metro Station, via a street entrance that is adjacent to the Dunkin' Donuts.

Video footage from WMATA shows the suspect entering the Georgia Ave-Petworth Station. The suspect was then seen on video boarding a WMATA Metro train at approximately 1:31 PM. He was later seen exiting the train one stop away at the Fort Totten Station at approximately 1:35 PM.



***Suspect in the Metro following the February 3 Dunkin' Donuts robbery***

A detective from the Metro Transit Police Department ("MTPD") determined the SmarTrip card number used by the suspect to pay the fare upon entering the Georgia Ave-Petworth Station, which ended in 0009. The same card ending in 0009 was used by an individual exiting the Metro at Fort Totten Station at approximately 3:52 PM. A review of video footage showed an individual wearing a white sweater with a swirl pattern, dark colored pants, and white shoes.



***Suspect exiting the Metro following later on February 3, the day of the Dunkin'
Donuts robbery.***

6. <u>**Arrest of David Williams on February 3, 2025**</u>

Following the Dunkin' robbery, a detective with Washington Area Metropolitan Transit

Authority police tracked Williams on WAMTA CCTV and was able to identify the SmarTrip card

used by Williams, ending in 0009. the WAMTA police detective put a tracking list alerting law

enforcement to stop the individual who next used that card. In addition, the detective reviewed

WMATA video footage from when the card was previously used. The detective identified footage

from one day earlier, February 2, 2025, showing an individual using the card ending in 0009.

Notably, the individual was wearing what appeared to be the same shirt and pants that he was

wearing following the Dunkin' Donuts robbery on February 3, 2025, and what appeared to be the

same shirt and jacket as in the December 30, 2024 Manny & Olga's robbery. The individual also had a crossbody bag. The video showed the individual without any mask. A lookout was distributed to law enforcement with still image from the February 2 video.



***Still images depicting the individual using the SmarTrip card ending in 0009 on February 2***

At approximately 7:29 PM on February 3, 2025, Metro Transit Police officers received a notification that the same SmarTrip card ending in 0009 was used to enter the Potomac Avenue Metro Station. A review of video footage showed the individual using the card wore a green ball cap, plaid jacket, green fleece pants, and white shoes. The jacket is consistent with the jacket worn by the suspect on December 30 for the robbery of Manny and Olga's.



*Still images depicting the individual using the SmarTrip card ending in 0009 to enter the Metro later on February 3*

An individual matching the description was observed by MTPD officers at the Addison Road Metro Station on a Largo-bound blue line train. The MTPD officers approached the individual on the train. The individual raised his hands and advised officers that he had a gun in his bag. He dropped his bag and was handcuffed. The individual told a woman he was on the train with that, in sum and substance, he would be going away for a while for the thing he did that day. MTPD officers recovered a pistol from the individual's bag and placed him under arrest. During a search incident to arrest, officers recovered the SmarTrip card ending in 0009, a DC ID Card identifying the individual as DAVID WILLIAMS, and a cell phone.

At the time of WILLIAMS' arrest, he was wearing a plaid jacket that appears to match the jacket worn during the December 30 Manny & Olga's robbery. He also wore a sweater, green

sweatpants, and a pair of camouflage pants under the green sweatpants. The camouflage pants appeared to match the pants worn during the February 3 Dunkin' Donuts robbery.



*A photograph of the clothing worn by WILLIAMS at the time of his arrest*

### 7. <u>*Search of 4238 Gault Place Northeast, Washington, D.C.*</u>

Following his arrest, an MTPD detective reviewed telephone calls placed by WILLIAMS from the Prince George's County Department of Corrections after his arrest.

On February 4, 2025, WILLIAMS placed a call to a number ending in 9785 and spoke with a woman, believed to be N.G., as explained below. WILLIAMS and the woman discussed his arrest on the Metro train. WILLIAMS said that the firearm he had did not have a serial number and was not registered. WILLIAMS told her that they were tracking his SmarTrip card. WILLIAMS explained that earlier that morning when he got on the train and "bust they ass," they saw what SmarTrip card he was using and used it to track him.

WILLIAMS asked where his bags were and the woman told him that they were in her room on the ground. WILLIAMS told the woman to keep his socks and boxers that she might use and

take everything else and throw it away. The woman told WILLIAMS that she will keep all of his clothes.

WILLIAMS placed another call on the same day, to the same 9785 number. WILLIAMS told the woman that he had an old phone in one of his bags, a big Under Armour bag. He asked the woman to use his phone to access his Gmail and told her that the phone passcode was "1993." The woman told Williams that she would put all of his stuff into a blue tote and throw all of his bags away so there would be no evidence of them. WILLIAMS said that inside a black duffel was the hoodie that he had been wearing. He told her to throw the bag away with all of the clothing that is in it after making sure that the phone is not in it. The woman referred to this bag as the bag that WILLIAMS had "with him."

Following his arrest, as captured on body worn camera footage, WILLIAMS indicated that he does not have a place to stay and has been staying at hotels.   When pressed for a mailing address, the person I now know to be N.G., who was also present, told WILLIAMS to provide her address.   WILLIAMS then gave MTPD officers N.G.'s known address.

On February 7, 2024, the Honorable Matthew J. Sharbuagh found probable cause and issued warrant 25-SW-31 to search that address for evidence related to robberies including the December 30 Manny & Olga's robbery and the February 3 Dunkin' Donuts robbery.

On February 7, 2024, law enforcement officers conducted a search of N.G.'s address. In a trashcan outside of the residence, officers found a bag containing a light-colored sweatshirt with vertical stripes consistent with the one worn by the suspect during the December 30 Manny & Olga's robbery and the February 3 Dunkin' Donuts robbery.

A. **SIMILARITIES BETWEEN THE FIVE ROBBERIES**

There are many similar elements in the modus operandi of these robberies. First, except for the most recent robbery on February 3, all of the robberies targeted restaurants located on a 1.75-mile length of Pennsylvania Avenue Southeast. Indeed, most of the known robberies occurred at The Shops at Penn Branch shopping center. Second, the suspect fled on a WMATA Metrobus following the robberies on December 29, December 30, and January 14. Further, in at least two of these, the suspect exited the bus approximately one block away from and then walked toward the intersection of Pennsylvania Avenue Southeast and 27th Street Southeast. Third, following the robberies on December 30 and January 14, the suspect altered his appearance by placing the coat he wore into a bag. Fourth, the suspect used similar language during the January 14 Chipotle robbery ("You think I'm playing with you?") and the February 3 Dunkin' Donuts robbery ("Do you think I am playing?"). Finally, the suspect's stance and manner of holding the gun were similar during many of the robberies.



***Similarities in the July 3 (top left), December 29 (top right), December 30
(bottom right), and January 14 (bottom right) robberies***

There are also numerous similarities in clothing and other items worn or carried by the suspect during these robberies. First, the shoes that the suspect wore in the December 29 robbery appear to be the same as those that the suspect wore during the January 14 robbery.



***Similar shoes worn during the December 29 Subway robbery (left) and the
January 14 Chipotle robbery (right)***

Second, the hat worn by the suspect in the robbery on December 29 appears to be the same

as that worn by the suspect in the robbery on December 30.



***Similar hat worn during the December 29 Subway robbery (left) and the December 30 Manny and Olga's robbery (right)***

Third, the watch worn by the suspect in the robbery on July 3 appears to be the same as the one worn by the suspect in the robbery on December 29. This watch was recovered from defendant Williams upon his arrest.



***Similar watch worn during the July 3 Subway robbery (left) and the December
29 Subway robbery (right)***



***Watch recovered from Williams***

Fourth, the suspect in all robberies wears a hat and/or face covering. In four of the

robberies, the suspect wore a shoulder bag. The shirt and shoulder bag worn by the suspect during

the December 30 Manny & Olga's robbery appear to be the same as those worn by WILLIAMS

during the February 3 Dunkin' Donuts robbery. The shoulder bag also appears to be the same bag that WILLIAMS had when he was arrested.



***Closeup of the bag carried by the suspect in the Manny & Olga's robbery (left),
the bag carried by WILLIAMS in the Dunkin' Donuts robbery (center), and the
bag carried by WILLIAMS at the time of his arrest (right)***

In addition, the coat worn by the suspect during the December 30 Manny & Olga's robbery appears to be the same as the coat worn by WILLIAMS at the time of his arrest.



***Similar clothing worn during the December 30 Manny & Olga's robbery
(bottom); the February 3 Dunkin' Donuts robbery (top left); and on February
2, while using the same SmarTrip card as the February 3 robbery (top right)***

The stripped hoodie seen worn by defendant Williams in the above stills was recovered during the execution of a search warrant of a residence known to be used by defendant Williams. See below.



***Striped hoodie recovered at residence connected to defendant Williams***

Further, the shoes worn by the suspect during the December 30 Manny & Olga's Robbery

appear consistent with the shoes worn by WILLIAMS at the time of this arrest.





***Closeups of the shoes worn by the suspect during the Manny & Olga's robbery
(top left/top right) and the shoes worn by WILLIAMS at the time of his arrest
(bottom left/bottom right)***

Finally, the appearance of the firearm used is consistent between the robberies, including

cutouts from the firearm's slide seen on video of some of the robberies that is consistent with the

firearm recovered during WILLIAMS' arrest on February 3, 2025.



***A closeup still image of the firearm used during the December 30 Manny &
Olga's robbery (left) and the firearm recovered from WILLIAMS on February
3 (right) showing the same slide cutouts***

## PROCEDURAL HISTORY

The defendant was initially arrested on February 3, 2024, in Maryland. On February 4,

2025, the D.C. Superior Court Judge Julie H. Beck found probable cause to believe that

WILLIAMS had committed the February 3 Dunkin' Donuts robbery in violation of 22 D.C. Code

Sections 2801 and 4502 (2001 ed.) and issued an arrest warrant. On February 6, 2025, Mr. Williams waived an extradition hearing and agreed to return to the District of Columbia.

Mr. Williams was returned to D.C. and charged with one count of Robbery While Armed in D.C. Superior Court case number 2025-CF3-001308 in relation to this offense on February 7, 2025. At his initial appearance, he was ordered detained pending a preliminary hearing scheduled for February 10, 2025. The Superior Court Case was dismissed without prejudice on February 10, 2025.

Also on February 7, 2025, the government filed a complaint in the instant matter in U.S. District Court, charging four counts:

| | |
|---|---|
| Count 1: | 18 U.S.C. § 1951 (Interference with Commerce by Robbery) on December 30, 2024; |
| Count 2: | 18 U.S.C. § 924(c)(1)(A)(ii) (Using, Carrying, and Brandishing a Firearm during and in relation to, and Possessing a Firearm in Furtherance of, a Crime of Violence) on December 30, 2024; |
| Count 3: | 18 U.S.C. § 1951 (Interference with Commerce by Robbery) on February 3, 2025; and |
| Count 4: | 18 U.S.C. § 924(c)(1)(A)(ii) (Using, Carrying, and Brandishing a Firearm during and in relation to, and Possessing a Firearm in Furtherance of, a Crime of Violence) on February 3, 2025. |

The Honorable Matthew J Sharbaugh issued an arrest warrant.

At the defendant's initial appearance on February 10, 2025, the government orally moved for detention, pursuant to 18 U.S.C. § 3142(f)(1)(A) & (E), as the offense involved a crime of violence and the use of a firearm.

## **ARGUMENT**

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). The Act provides, however, for certain crimes, that there is a rebuttable presumption

that no conditions or combinations of conditions will assure the safety of the community. A rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" applies if the Court finds probable cause that the "person committed . . . an offense under section 924(c)." 18 U.S.C. § 3142(e)(3)(B).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. at 36.

A review of the 3142(g) factors makes clear that no condition or combinations of conditions will assure the safety of the community if Mr. Williams were to be released.

**A.     <u>The Nature and Circumstances of this Offense Merit Detention.</u>**
The first factor to be considered, the nature and circumstances of the offense charged,

weighs overwhelmingly in favor of detention. The defendant is charged with a committing multiple crimes of violence and brandishing a firearm at victims while doing so and substantial evidence exists that he committed three other robberies. In violating 18 U.S.C. § 1951(a), the defendant used weapons to ensure that his criminal acts would result in the outcome he favored: the taking of money that did not belong to him. As a convicted felon, the defendant is prohibited from owning a firearm. Yet he repeatedly and brazenly used a firearm on several occasions to frighten store employees into handing over money that did not belong to him.

The danger posed by pointing a gun at another human being during the course of a robbery cannot be overstated. "The best outcome, if everything goes as planned during an armed robbery, involves a victim's being placed at risk and feeling terrified for his safety, possibly for years to come, and if things go wrong, someone—or multiple people—could be killed or seriously injured." *United States v. Lee*, 195 F. Supp. 3d 120, 129 (D.D.C. 2016) (finding detention appropriate for a defendant who committed one armed robbery where his co-conspirators possessed a gun).. Indeed, the nature of the 18 U.S.C. § 924(c) offense charged here is such that Congress has specifically enumerated the charge as carrying a rebuttable presumption in favor of detention. Mr. Williams has compounded this grave risk by repeating his conduct, pointing a gun at multiple victim–employees over a course of months.

Defendant brandished a gun at employees of D.C. restaurants because he intended to instill fear in them to ensure their compliance with his demands. This created the danger of a violent response by employees attempting to defend themselves, further risking the safety of all present. He made the conscious decision to repeatedly victimize people at gunpoint for his own financial gain. Indeed, the offenses demonstrate that these were not impulsive offenses. Rather, they were premeditated and deliberate, as he repeatedly came equipped with a bag and clothing to change his

appearance as he fled. The extremely dangerous nature of the defendant's conduct favors his detention.

**B.**    <u>**The Weight of the Evidence Against the Defendant is Formidable.**</u>

The second factor to be considered, the weight of the evidence, also strongly weighs in favor of detention.[1]

To briefly recap the above, Mr. Williams is captured on video at the locations and while fleeing from each of the robberies. During both the December 30 Manny & Olga's Robbery and the February 3 Dunkin' Donuts robbery, the video shows him wearing a distinctive hooded sweatshirt with vertical stripes. Immediately after both robberies, Mr. Williams is depicted on video using public transportation to flee the scene then changing his outfit shortly thereafter. After his arrest on February 3, 2025, Mr. Williams is heard on a recorded phone call asking an individual, N.G., to throw out his clothing that he left at N.G.'s residence. When law enforcement conducted a search of N.G.'s residence, they discovered a gym bag in the trashcan. The bag found contained a hooded sweatshirt with the same distinctive vertical stripes. There were also several rolls of coins—such as those that would be stocked in a cash register and were most likely stolen during the offenses above—found in the bag.

---

[1]    This factor should be equally weighed along with the other factors. In *United States v Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are— in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.



*Sweatshirt with Vertical Stripes from behind on December 30 (left) and February 3 (right)*



*Sweatshirt with Vertical Stripes from front on December 30 (left under the jacket) and February 3 (right)*

In addition, footage from the Metro shows Mr. Williams wearing the same distinctive

plaid jacket that he also wore during the December 30 Manny & Olga's robbery when he used

the same SmarTrip card on other occasions. He was also wearing that plaid jacket at the time of his arrest.



*Plaid Jacket on December 30 (left), February 2 (center), and at the Time of Arrest (right).*

Further, Mr. Williams was wearing the same green crossbody bag during the December 30 robbery, the February 3 Dunkin' Donuts Robbery, and at the time of his arrest.



*Green Crossbody Bag on December 30 (left), leaving the Dunkin' Donuts on February 3 (center), and at the time of his arrest (right).*

Mr. Williams was also arrested with a black handgun with the same distinctive cutouts

from the slide as depicted in video footage of the December 30 Manny & Olga's robbery.



***Firearm used on December 30 (left) and the firearm recovered from
WILLIAMS on February 3 (right)***

The distinctive clothing and accessories worn and used by Mr. Williams during and shortly after the robberies, as well as at the time of his arrest, provides strong evidence of his guilt in this matter.

"[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. This is such a case, and the defendant should be detained pretrial.

**C.    The Defendant's History and Characteristics Merit Detention.**

The defendant's history demonstrates that his release poses a risk to the safety of the community and a prior failure to comply with release conditions. While Mr. Williams' criminal history is remote, it is also very serious and concerning given its similarity to the instant offenses.

Mr. Williams was convicted of Robbery While Armed and Attempt to Commit Robbery on August 9, 2010, in D.C. Superior Court case number 2010-CF3-005739. The convictions stem from a string of armed commercial robberies with some similarities to the charged offenses here.

As outlined in the criminal complaint filed in Superior Court on April 1, 2010, Mr. Williams used what appeared to be a handgun to rob a store clerk of cash. When officers apprehended Mr. Williams, he was found with a Glock model replica BB gun. He told law enforcement that he had used the BB gun in two additional robberies of commercial establishments, including a restaurant on March 29, 2010. Mr. Williams pleaded guilty to the March 29, 2010 robbery and the March 30, 2010 robbery. As part of the plea agreement, the government agreed not to pursue additional charges related to the robbery of a third business. Mr. Williams was sentenced to 18 months in jail, followed by five years of supervised release on one count and 24 months in jail fully suspended on the second count. Mr. Williams was released from custody on July 22, 2011.

Barely a month after his release and while on supervision in 2010-CF3-005739, on August 25, 2011, Mr. Williams committed another armed robbery when he approached a victim near his home and pulled out a revolver, as outlined in the Complaint filed in D.C. Superior Court case number 2011-CF3-016420. He took the victim's cell phone and ring. Subsequently, Mr. Williams was convicted of Robbery and Unlawful Possession of a Firearm (Prior Conviction) in that matter on December 16, 2011. Mr. Williams was sentenced to incarceration for 54 months and 3 years of supervised release on the Robbery conviction and incarceration for 36 months and 3 years of supervised release on the Unlawful Possession of a Firearm conviction. The sentences were to be served concurrently.

According to the Pretrial Services Agency Report in this matter, Mr. Williams' term of supervised release in D.C. Superior Court case number 2010-CF3-005739 was revoked on December 14, 2015, and he was resentenced to a new term of imprisonment of 36 months due to his arrest connected with the 2011 robbery. This appears to be due to the 2011 convictions.

Given the above, the defendant's history and characteristics indicate that he is likely to be a danger to the community if released. Mr. Williams' criminal history contains a remarkably similar string of armed robberies in his past. Shortly after his release for his first conviction for a string of armed robberies, he again committed an armed robbery. He has now committed a string of armed robberies over a course of months. Thus, the defendant's history demonstrates that he has been a persistent danger to the community.

Further, Mr. Williams' history suggests that he will not comply with release conditions. While acknowledging that he recently successfully completed a term of supervised release, Mr. Williams previously demonstrates that he was no able to successfully comply with release conditions. He committed his 2011 armed robbery a month after being released from prison for a string of armed robberies and while he was still on supervised release for that offense.

In light of his history of armed robbery convictions and prior incidents while on supervised release, this factor also weighs in favor of detention.

**D.    Mr. Williams Presents a Danger to the Community**

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also supports detention. The charged and suspected offenses here involve the use of a firearm to rob employees of multiple small businesses in the community. Mr. Williams repeatedly demonstrated a disregard of serious risk of death or injury to members of the community when he pointed a gun at another human being in order to obtain money. His conduct during the offenses was violent and created an incredibly dangerous situation for employees, uninvolved customers, and to the defendant himself.

The defendant's danger to the community, as with all the three prior factors, weighs heavily in favor of pretrial detention.

## **CONCLUSION**

Over the course of months, the defendant made the repeated decision to point a gun at other people in order to obtain money and property.   His incredibly dangerous conduct stopped only because he was arrested and detained following the most recent robbery.   .  The government respectfully requests that the Court issue an Order granting its motion and detain Mr. Williams pending trial.

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866


Dated: February 13, 2025          By:     /s/ Brendan M. Horan
                                               BRENDAN M. HORAN
                                               Special Assistant United States Attorney
                                               N.Y. Bar No. 5302294
                                               KYLE MCWATERS
                                               Assistant United States Attorney
                                               D.C. Bar No. 241625
                                               United States Attorney's Office
                                               for the District of Columbia
                                               Federal Major Crimes Section
                                               601 D Street NW
                                               Washington, D.C. 20530
                                               (202) 730-6871
                                               brendan.horan@usdoj.gov